Okay, the next case on the call is 5-16-237, Miller v. I'm sorry, I got the wrong one. 5-16-214, Milton v. I'm sorry, McDaniels v. Seavers. I thought it was the last one. Did I get the wrong one? I think you were right with Miller. Okay, Miller's next. I didn't get the right one. Sorry about that. If you want to argue, step up. Too many sheets of stuff here. I thought you guys would already be sitting down and ready to go. What's going on is, may it please the court, this is Turner. My name is Brian Smith and I represent Bill and Lola Bardos in this case. This is an adverse possession case. My clients Bill and Lola Bardos were good, free purchasers of a warranty deed in 2008. They bought the property from a lady named Lois Hanks. She bought her warranty deed in 2005 from Wayne and Opal Watkins, who bought theirs in 1974. All warranty deeds. There's no dispute that the property it issued, the plaintiff claims by adverse possession, is described in my client's warranty deed. The plaintiff's property and their neighbor's plaintiff's property was owned at all relevant times by Corrin Miller or her husband. And it's sort of sandwiched in with the Bardos' property, my client's property, on the north and to the east. And in this area, there's a strip of land that the plaintiff claims by adverse possession. And her claim is based on the existence of two fences. They were erected by Wayne Watkins, who owned the property from 1974 to 2005. There's a little bit of variation as to when these fences went up, but suffice it to say, sometime in the early 80s, the plaintiff testified in 81 or 82, Wayne Watkins puts these fences up on the property. Those fences are gone. And that's the reason that we're here. That's the reason that Bill and Willow Bardos have defended this action. Those fences are gone. They were torn down sometime between 2005 and 2008. They were gone before Bill and Willow Bardos ever set foot on the property. The plaintiff testified that these monuments, again, these fences went up in 1981 or 1982, which means her adverse possession claim would have been right in 2001, 2002. Again, before my clients ever set foot on the property. There's nothing in the record why she didn't bring an action then. There's nothing in the record why she didn't bring an action in 2005 when the property was conveyed to Lois Hanks. There's nothing in the record why she didn't bring an action in 2008 when it was conveyed to my clients. So we get to 2011, and the plaintiff brings this action. So the fences are the only monuments that the plaintiff can point to to prove the exact boundaries to which she claims adverse possession. And that's the standard. She has to prove by clear and convincing evidence the exact boundaries. There were two fences. One ran in an east-west kind of direction in the northern portion near the boundary between the plaintiff and the defendant. The other one ran in a north-south direction, and that's the one that we're mostly concerned about here. Again, these are the only monuments that the plaintiff ever pointed to establishing these boundaries. And neither of those fences is in existence today. It's undisputed. So, and again, torn down between 2005 and 2008. Now, there is a fence there. That fence was erected by Mickey Hanks sometime between 2005 and 2008. Mickey Hanks is the daughter of Lois Hanks, who owned the property at that time. She tore the original fences down, put up a now-existing fence. Is there any portion of the original fence still in existence? The credible answer is no. The plaintiff testified on the day of trial that she was able to identify the purportedly original southern corner post of the original Watkins fence. It was something she was unable to do in her prior testimony, and she was impeached. But nevertheless, whether it is or it isn't the original southern corner post, and let me suggest to you that is the only thing that the plaintiff or any witness pointed to, testified to, said that is a part of the original fence. It's the only thing. The undisputed testimony is that that purportedly original southern corner post is not attached to the current fence. It's not attached. Why is that important? Because the plaintiff's entire claim is based on her assertion that the now-existing fence, the one erected by Mickey Hanks in 2005 or 2008, is in the exact same location as the Watkins fence. There's a little bit to be said about the location of this now-existing fence, but for now, if what the plaintiff identified as the original southern corner post is in fact the original southern corner post, her claim has to fail. Because her testimony is the now-existing fence is in the same place as the original fence. And clearly, if that's the original corner post, it's not true. It's not credible. The plaintiff has the burden of showing by clear and convincing evidence the exact location. This is what the Illinois Supreme Court said in the case of Schwartz v. Piper. It's still good law. It is dispositive of this entire issue. What the court said there is where the location of a boundary is marked by a monument at the inception of the adverse possession period or during the continuance of that period, and the monument is lost or destroyed, the location of the boundary or monument must be susceptible of definite proof. And what we've seen in clear and convincing cases regarding adverse possession is there's a presumption that the title owner is the owner of the adverse possession. It takes clear, unequivocal evidence to take that property from the title owner and move it to a person claiming it by adverse possession. The plaintiff must establish the location of that boundary where there was a fence or some sort of monument with reasonable certainty, and the Supreme Court in Schwartz says that's exact. Close is not enough. Even a variation of one or two feet is of, quote, grave importance, end quote. That's what the Supreme Court said in Schwartz, grave importance, one or two feet. The Schwartz case is eerily similar to the case at Barr. There were plaintiffs and defendants who were neighbors. The plaintiffs claimed a portion of the property between the two residents by adverse possession, and there had been an old iron fence that was the monument. And the old iron fence was gone. And so the plaintiff put four witnesses out. One of them said it's about three feet south of the sidewalk, or one of them said it was two to three to four feet south of the sidewalk. I think there was a plaque that said it was six feet south of the sidewalk. There was a witness that had it attached to a shed and had it running, quote, quite a bit or quite a ways from the sidewalk. And the defense, they put a witness forward that said, no, that fence was all the way up against that sidewalk. It was nipping that sidewalk at its closest point. Counsel? Yeah. Does this case come down to the court's finding, the 23.8 feet finding going to the corner post, and that was part of the original fence? Yes, Your Honor, it absolutely does. If there is anything that shows that the court's order in this case is against the manifest weight of the evidence, it is the court's description of the purported boundary proven by the plaintiff. And here's how this goes. On the survey that was submitted into evidence, there were several stipulations, and there were handwritten numbers on the survey. And what the handwritten numbers were, for the most part, were the distance between what is the now existing fence, as it existed at the time of the survey, and the plaintiff and the fence property line. So there's a 33 feet and there's a 50-something feet, and all of those are stipulated. Those are the distances between the property line and the then existing fence, which is the Mickey Haynes fence. There is 23.8 written at the very bottom of the survey, and the stipulation is that distance is not the distance between the property line and the existing fence. That distance is from the property line to the purportedly original southern corner post, 23.8 feet. And so the trial court describes the eastern boundary proven by the plaintiff as follows. Beginning at the southernmost point of the now existing fence, which is a point approximately 23.8 feet northeast of the plaintiff's property, southeast corner. We stop right there. This statement is unsupported by any facts in the record. That 23.8 feet is not where the now existing fence is. 23.8 feet is where the original corner post is. And this is important because it is undisputed that that corner post is not connected to the existing fence. So when the trial court says we're going to start at the southernmost point of the now existing fence, which is 23.8 feet away from the property line, there's nothing in evidence to suggest that's even remotely true. We don't know where the southernmost point of the now existing fence is. There's nothing in evidence that says where it is. 23.8 feet, that's not where the now existing fence starts. So the trial court has picked a point that is not supported by evidence to start its line and then continuing, proceeding northerly along the current fence line. Same problem. There is no current fence line proceeding from 23.8 feet. This is what the defendants have argued all along, that the plaintiff is unable to prove by clear and convincing evidence where those original fences were. And the trial court's description of the boundary is the probably seminal thing that demonstrates that the defendants are right here because the trial court has described a line that's not in evidence, that there's no basis for it in evidence. For that reason alone, the trial court's determination has to be against the manifest way of the evidence. It has to be because it's simply not based on the evidence in this case. And the problem with the trial court's order is Schwartz is dispositive. It's a Supreme Court case that the trial court appears to have ignored. And Schwartz has almost identical facts as ours. We've got a fence that's gone. We've got witnesses that come in and give varying degrees of where the now existing fence is in relation to the old fence. The plaintiff said the existing fence is in the exact same location except for the middle of the fence where Mickey Hanks moved this portion and except up in the northern portion where Lola Bardos moved a portion of it. And now if we accept her testimony that the original corner post is there and it's not attached, the plaintiff's testimony sounds a little like this. The existing fence is in the exact same position as the original fence except for in the north and the middle and in the south. And all of the witnesses give varying accounts. One of the witnesses believed that it was the original fence. All of the witnesses can see that the fence has been moved to one degree or another. The person who put the fence up, Mickey Hanks, who is the only witness who's really not invested in this case. The other witnesses are family and friends of the plaintiff. Mickey Hanks doesn't have a dog in this fight, and she testified, I put the existing fence up. And it's A41 of the appendix. She said, I put the fence up right where the original fence had been, but the fence now is not where I put it. And she drew a line on a photograph during her evidence deposition. It's A41 of the appendix. And it tracks right up against a concrete slab. And she said that's where I put that fence, and the fence has been moved since then. So the trial court didn't like Mickey Hanks' testimony, thought it was equivocal. I respectfully disagree. I think her testimony was very credible, and it was not equivocal. But regardless of that, the defendant doesn't have the bourbon proof in this case. What we have is a situation similar to Schwartz, where we have the plaintiff's witnesses all say, at varying degrees of one thing or another, within one, two, or three feet, maybe here, maybe there, moving fence. And we've got the defense witness who says, no, it's way up here. That's exactly what happened in Schwartz. And the Supreme Court in Schwartz said that's not good enough. You have to have clear, unequivocal evidence of where those fences were. You have to have clear, unequivocal evidence of the boundary to which you claim. Because if we're going to say that all of the presumptions are in favor of the true owner, then you've got to clearly and unequivocally establish to where you're going to take that property from the true owner. Close doesn't cut it in Schwartz, and it can't cut it here. A quick word about some other cases. The Bacutus case, different result reached. Why? Because there were landmarks. The plaintiff could point to a landmark here, a landmark there. In that case, it was a hedge post and a concrete walkway. So there was an old fence that's gone, but we've got a hedge post and a concrete walkway. That's where the fence was. And the court says, yeah, that's clear and convincing evidence. Same thing in Curleys v. Fisher. You had a stone marker, a clearly visible cropline, and the same highway. And the court said, yeah, you know what? That's good enough. Didn't have that fourth boundary, but they said, you know, we can draw, we can see the square coming here because they had clear, visible markers. We don't have anything like that in this case. You've got a fence that's gone and a corner post that's not connected to the fence that's there. I'll say one brief word about Plaintiff's Exhibit L, which is the photograph. The trial court obtains this discretion by allowing this photograph into evidence. The date can't be established. You've got one witness saying it's from the 1970s. You've got another witness saying it's from the late 80s. You've got a witness saying it was purchased in 1991. The date of the photo is critical in this case because if it's from the 1970s, then they can't possibly show anything relevant because all of the testimony is that the fences, the original fences, went up in the early 80s. So if this photograph's from the 70s, there's nothing to talk about. And even assuming the photo was properly admitted, the plaintiff admitted in her brief that Plaintiff's Exhibit L was not used by any witness to claim a location of the original Wayne Watkins fence. If that's true, then the photograph has no relevance. So in addition to a lack of foundation, in addition to not knowing where the photograph is from, it's not relevant for any purpose. In one quick word about the survey, Plaintiff's Exhibit K, we talked about the survey briefly and the stipulations about the survey. The plaintiff relies heavily on the survey in her brief, and I'll suggest that the survey shows the location of the now-existing fence as it existed on September 30, 2009. What it does not show is the location of the southern point of that now-existing fence. And we've covered this. That distance, 23.8 feet, is not where the now-existing fence is. So it is impossible to rely solely on that survey to draw a line to which the plaintiff has claimed, to draw a line where the original Wayne Watkins fence was. And that's really the crux of it. If the plaintiff can't prove where that fence was, the plaintiff can't prove Edwards' possession. Bill and Lola Bardos didn't set foot on that property until 2008. They were present at the trial. The plaintiff could have called them to testify. It is improper to say that there's a presumption that because they did not testify that their testimony would have been somehow adverse to their position in this case. The fences were gone long before they got there. So for those reasons, Bill and Lola Bardos respectfully request that this court reverse the trial court's determination that the plaintiff has proven that boundary line. Because if she can't prove that boundary line, then she can't prove the evidence of Edwards' possession. Thank you very much. If that pleases the court, counsel, I just heard what he had to say. I want to make a few minor clarifications quickly here. The fence, there's no dispute that the fence at issue here, which was the demarcation of the property line or assumed property line between the parties, was erected prior to 1983 or during the year 1983. That was done by Wayne Watkins. There's ample testimony to that effect, and there was absolutely nothing to contradict that. Wayne Watkins and his wife sold the property that they owned to Mickey Hanks' mother in 2005, presumptively for the benefit of Mickey Hanks, who would live there. After Mickey bought the property sometime after she bought it, or before she sold it in 2008 to the defendants in this case, she replaced the existing fence. Her testimony was that she would take down a part, put it back up, take down a part, put it back up. Her testimony was that she did it as near as possible in the same location, and the whole fence was put up, and it was a straight line. She said she didn't claim anything on the Miller side of the fence at any time. And Watkins never claimed anything on the Miller side of the fence at any time either. Hanks then says that during the period of time that she owned it, three years, she caused a bow to be placed into the fence to give a little more room around the concrete patch she claims was recently poured, which was disputed by other testimony. But she bowed it in on her property. She did claim what's within the bowed area, and what would have been east of the straight line fence that previously had been located. And Miller's never claimed anything within that bowed in area either, because they understood that to be an accommodation, and they knew that the fence line was the original line. Now, what is very, very important to hear is that Mickey Hanks said when she got the property, she was told where the lines were by the previous owners. She also, when she got sold the property, they were in the same location except for the bowed in area. Now that means that when Bartles took possession of the property, the north end and the south end were in the same location, and there was a bowed in area that had been created by Hanks. What is important here is before any other modifications of that fence were made, Bartles caused a survey to be prepared, and the survey that was prepared identified the northernmost points, the southernmost points, and some points in between. What we have here is that I think we only have to show that the boundary line is reasonably ascertained. I don't think we have to have laser-like precision to show what that line is. If you look at the Vicudis case, there was a concrete right-of-way marker on the street side of the property. There was a hedge post on the other side of the property. They said that's the line. Now, the judge in that case said the line is from point A to point B. I don't know who put the fence up originally. I don't know what they claimed the line to be, but I would almost guarantee that it wasn't with laser-like precision that the prior fence that had been removed was in that location. Counsel, what about the 23.8 feet argument set forth by Mr. Smith that that didn't have anything to do with where the fence was? It was just at the corner post, and there was no relationship between the two? I think there is a relationship, and you've got to remember, too, that the court in this case viewed the property, and the court's decision was you start at this corner post on the south side and follow the fence. Now, the only interpretation of that can be that the fence was in line with the corner post from the corner post to the fence to the north corner. I think that's the only interpretation. And, unfortunately, you folks don't have the opportunity to see the land as it was on the day of the trial when the judge, the attorneys, and the parties were present to look at the property, see that post, see that fence. And we also know, too, that that post, if you look at the survey, is not on the southern line anyhow. The southern line of their property is a little bit south, and if the property is angled northeast, the surveyor says northeast 23.8 feet from the actual survey description of the property. I don't think there's any discrepancy there at all, Robert. It's one consistent line. It goes from south to north. It is far more like the Bacutus case than any other case because we have a definite point on the south and a definite point on the north. The definite point on the north, although removed, has been monumentally documented by a survey that has been, by agreement of the parties, submitted to the court to be used as evidence. So I think we've got the north and south line. Mickey Hanks' testimony goes on later to say, hey, that fence has been moved. Well, the uncontradicted testimony was that after the survey, borrowers on the north end of the property moved the north portion, the north-south portion of the north-south fence to the west over to where the survey line was. They moved the north boundary, which was the east-west fence, south in that same area to create a kind of a square in the northeast corner of the property that had previously instilled this claim by Miller. That was moved. There's no controversy whatsoever anywhere in the evidence, the documents, to indicate that that was not the case. It was moved by borrowers. Now, what is interesting there, look at the photograph that Mr. Smith was talking about, and that's the photograph A41. That's the photograph that Mickey Hanks drew a line on. And that photograph, folks, shows a line drawn west, west of where the fence had been moved by borrowers. It is west. You can see where the line starts over here. On this photograph, you see it go over and go back to the original line. It goes here, it goes back over to the original line. She drew a fence line that's over here that's probably, if you just look at the fence post, probably at least 20 feet west of where the fence was as moved by borrowers. Mickey Hanks' photographic indication of a fence line cannot be correct and is drastically inconsistent with her testimony and the testimony of everybody else. There is nothing in that photograph that can be held consistent, could be believed by anyone to represent the location of the fence at any time from the time that it was erected in 1983 or after. Now, had Bartles testified, they would have said, yeah, they would have agreed. We moved that fence in the northeast corner of what Miller claims to create that angle. And yes, that line that Mickey Hanks drew is west of that farther on to the Miller property than what even the survey claimed it was supposed to be. There's just nothing to support that at all. We get to the photograph, too. You know, we claim that that fence line was a straight line from point A to point B, north to south, from point B to C across the north boundary of the property. And that photograph, more than anything else, I'm talking about Plants Exhibit L, that photograph, when you look at it, shows what looks like an extraordinary straight-line fence that goes through there. Now, everybody testified that that photograph was made somewhere between, say, late 80s, early 90s. My client, the plaintiff, had the photograph in her place of business for a couple of decades, looked at it on a daily basis, was familiar with it, knew what it was and where it came from, was familiar with the property because she lived there, and they constructed the structures on it. Now, one witness we called, Arthur Kidd, testified he'd been there since 1970. I don't know where he got that. I don't have any idea. But there is nothing other than that one statement that would suggest it happened any time other than late 80s, early 90s. What is important about that is just to show it was a straight-line fence from A to B and that there were no jobs, curves, twists, turns, what have you in it. And the fence that was built in 1983, that remained there until after 2005, some 22-plus years, and then was replaced in the same location by Mickey Hanks for maybe another year or two, then a bowl put in it. Adverse possession had occurred before Mickey Hanks touched the fence. That was an established fact. Adverse possession was in place. She didn't claim anything on the other side after she took it. There was no reason for Miller to bring litigation against anybody until Barnos moved the fence over and took over part of it. Her septic system had been there since 1970. What they can't show is that there was any modification other than the bowl in the fence. Barnos, had they testified, would have said, yes, when we took possession, the fence was here, there was a bowl in it, we moved this over here. There's no reason really for them to testify because they've got nothing to say other than to confirm what the plaintiff alleges in her complaint and in their testimony. I believe the issue is to the corner post. I mean, why do we call it a corner post, you know, and having judged I haven't seen it, I mean, the corner post indicates it's a fence post. A corner post, I don't know, just I think practical knowledge, if you go to the fence, and you go out in the cattle farm and you go to the corner post, the fence is going to be on the outside of the post on one property and it'll be on the inside of the fence on the other. If you call it on the inside of the fence, that doesn't necessarily mean much, I don't think. Particularly when the judge had the opportunity with his own eyes to visualize, to look at, to examine, to see, have it pointed out. Matter of fact, when the exhibit was off of the survey, the judge said, now, is this the corner post that we saw today or is this measurement to the fence or what is it? The judge was familiar. He points out, I mean, he knows that there's a corner post, he knows there's a fence, and he knows what he's talking about, and it would be inconsistent for him to say start at the corner post and follow the fence north to a point. I think if you start at the corner post that's not in line with the fence, you can't very well follow the fence. That's an inconsistent statement. My question is about the bow. My question is, is the emperor's possession claiming any ground inside that bow? No, sir. Never has. It's clearly stated in the testimony evidence. Our complaint specifically states that. It was an accommodation made by Mickey Hanks, the cushy head. Permissive. Yeah, it was permissive use, and it was only for a few years, Judge. It was nowhere near the 20-year deal, and the agreement was that, and I think the testimony is that if they sold it, that fence could be moved back to its correct location, which would be the straight line between A and B. I have a problem also with the slab of concrete. Is the concrete was always on the non-claimant's property, or on the claimant's property? Yes, as a matter of fact, we have some photographs. My client, I think, I'm going to apologize if I make a mistake, but I believe my client testified that there was a structure on top of that, and that, in fact, the structure was removed. We have photographs to show what looks like a very well-worn piece of concrete that otherwise would have been poured after 2005, okay? Well, we had a well-worn piece of concrete, and you can see where the fasteners to hold the walls down were around the perimeter of this property, and you can still see the caulking that goes around where the sill for the plates for the studs have been. It's still on the property, and it's, like I say, it's a well-worn piece of concrete. Now, obviously, if you just look at it, you can tell it wasn't poured two or three years before. So no matter which way the court is, it's not even filed here? No, well, in my opinion, it isn't. If you look at the survey, the survey line runs through the property. The survey line runs through the piece of concrete, Judge. It does, but the fence was over. The testimony was that the fence, by my client, was that she mowed between the concrete and the fence before it was mowed. There was an argument over how much distance there was. There was an argument about how much distance there was. Mrs. Hanks claimed that it was poured, which is inconsistent with any other testimony. It was poured while she was there, and maybe the forms were there. I think if you look at that photograph, there may be some other objects out there, a sandbox or something. And that's when the bull in the fence was. Yes. To give an extra room, because Mickey Hanks had some dogs that were maybe a little vicious or appeared to be a little vicious, would crowd right up there, and that gave them a little breathing room and less anxiety, I believe. But that's the story on the bull in the fence. I think it was all agreed to, permissive. We make no claim to anything within that. Arthur's kid's testimony was inconsistent only in the regard that I spoke about. Mickey Hanks was inconsistent in a number of places, a number of ways, but most importantly, her line on the photograph could not have been anywhere near correct. It would have been off by probably somewhere in the neighborhood of 35, 40 feet from where her fence was at. She hadn't been on the property since she sold it, she said. Her deposition was taken, I believe in Georgia, but we didn't attend except by telephone. And her testimony, and handed a photograph that shows a fence in there. I don't know what she did, but it is inconsistent with all the facts of the case. Inconsistent, too, I might add, with the judge's observation of where that cutout area is in the north corner. I mean, the judge was there, he saw the south line, saw where the north line should have been, saw the cutout. It's really not a rectangle, but a long ram or something. He saw where that was at, and he knows, by his own observation, that that fence could not have been where she drew it to be based on her testimony, based on testimony of every other witness. Just not right. And I don't know that if... I didn't find anything to say that the department puts up a fence and then 30 years later, when it needs to be replaced, it puts it back, the new fence, new post, new wire, everything. He's trying to get it to the same place, that all of a sudden that's no longer the boundary line. I think, well, we have to have some reasonable location, the boundary, we know where it's at, it's there. It's not feet off. There could be places where it'd be an inch off, I don't know, because it was not surveyed in advance. But I don't think we have to go to the point to say that the width of a strand of wire is going to make a difference. When she says, I pulled some post up, I put some new ones back, put some fence up, to me that means that it's as close as it possibly can be, and I think it's consistent with adverse possession, based on what she said. If you have any questions, I'd like to try to answer them, otherwise I can donate. Thank you. Very briefly, Your Honor, if it's as easy as Mr. Turner says, then why do we have a trial court describing a boundary that is inconsistent with all of the evidence? It's just not that easy. Laser-like precision is not what we're talking about here. But the Supreme Court says one to two feet is of grave importance, and if one to two feet is of grave importance, then the trial court did go out and view this corner post. So it is even more against the manifest way of the evidence that the trial court could view the corner post that is not attached to the existing fence and then purport to draw or describe a boundary line from the corner post of the existing fence. If the trial court saw it, then the trial court saw that it's not connected. And further to that, there is no evidence in the record how far away the existing fence is from the existing corner post. There's none. So threads or inches, that's not on the record. It could be 10 feet. It could be 100 feet. I mean, we could sit here and speculate all day, but the reality is it's just not in the record. And if it's not on the record, then it hasn't been clearly and convincingly proven. The defendants don't have the burden of proof in this case. So it's the plaintiff's own witnesses saying, yeah, there's an original corner post, and it's not connected to the now existing fence. That description of the boundary line cannot possibly be in accordance with the manifest weight of the evidence. And I'll leave it right there, because I believe that that's dispositive of this issue. Thank you. Thank you, counsel. The court will take this case under advisement. You'll be notified, of course.